IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.   1:16-cv-458

UNITED STATES OF AMERICA,

     Plaintiff,

v.

BNSF RAILWAY COMPANY,

     Defendant.

---

## COMPLAINT

---

The United States of America, by the authority of the Attorney General, and at the request of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

### NATURE OF ACTION

1.     This is a civil action against BNSF Railway Company ("BNSF" or "Defendant"), seeking civil penalties for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387. The violations include the unauthorized discharge of oil from railcars and locomotives into waters of the United States or adjoining shorelines in North Dakota, South Dakota, and Wyoming and the failure to comply with regulations issued under Section 311(j), 33 U.S.C. § 1321(j), of the CWA at rail yards in Colorado, North Dakota, and Wyoming.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action and Defendant under Sections 309(d) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(d) and 1321(b)(7)(E), and 28 U.S.C. §§ 1331, 1345, and 1355.

3.      Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), and 28 U.S.C. §§ 1391(b) and 1395(a), because a substantial part of the events or omissions giving rise to the violations occurred in this District and because Defendant does business in this District.

## DEFENDANT

4.      BNSF is a corporation organized under the laws of the State of Delaware, which at all relevant times has conducted business in the District of Colorado. It is the principal operating subsidiary of Burlington Northern Santa Fe, LLC, a holding company.

5.      BNSF owns and operates one of the largest railroad networks in North America, with thousands of route miles of track in multiple states, including Colorado, North Dakota, South Dakota, and Wyoming.

## STATUTORY AND REGULATORY BACKGROUND

### CWA's Prohibition of Discharges of Pollutants

6.      Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person," except, inter alia, in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

7.      Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

8.      Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."

9.      Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" to mean "any discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

10.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

11.     The term "waters of the United States," as defined in 40 C.F.R. § 122.2, includes but is not limited to traditional navigable waters, interstate waters, and tributaries of such waters.

**CWA's Prohibition of Discharges of Oil**

12.     Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the unauthorized discharge of oil or hazardous substances in "such quantities as may be harmful as determined by the President" into or upon the navigable waters or adjoining shorelines.

13.     Congress has directed the President to determine by regulation those quantities of oil and any hazardous substance the discharge of which may be harmful to public health or welfare or the environment of the United States. Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4).

14.     The President has delegated authority to the Administrator of EPA under Section 311(b)(3) and (b)(4) of the CWA for determining quantities of oil the discharge of which may be

harmful. Executive Order No. 12777, dated October 18, 1991, Section 8(a), 56 Fed. Reg. 54757, 54768 (October 22, 1991), superseding Executive Order No. 11735, dated August 3, 1973, Section 1(1), 38 Fed. Reg. 21243 (August 7, 1973).

15.     Discharges of oil that violate applicable water quality standards, or cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines are, for purposes of Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4), discharges of oil in such quantities that the Administrator has determined may be harmful to the public health or welfare or the environment of the United States. 40 C.F.R. § 110.3.

16.     For purposes of Section 311 of the CWA, 33 U.S.C. § 1321, the term "discharge" is defined to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping . . . ," subject to certain specified exceptions not applicable here. Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2).

17.     For discharges of oil prohibited by Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), an EPA regulation further defines "navigable waters" to include, inter alia, traditional navigable waters, interstate waters, and tributaries of such waters. 40 C.F.R. § 110.1.

### Spill Prevention Control and Countermeasure Regulations

18.     In 1972, Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* ("CWA"). In Section 311(j)(1)(C) of the CWA, Congress required the President to promulgate regulations that would establish procedures for preventing and containing discharges of oil from onshore facilities into navigable waters.

19.     The authority conferred by Section 311(j)(1)(C) of the CWA was delegated to the Administrator of EPA. In 1973, the Administrator promulgated regulations for preventing discharges of oil from non-transportation-related onshore facilities. 38 Fed. Reg. 34164

(December 11, 1973). Those regulations have been codified at 40 C.F.R. Part 112, Subparts A through C, and are referenced as the "Spill Prevention Control and Countermeasure Regulations" or simply "SPCC Regulations."

20.     The SPCC Regulations apply to owners and operators of non-transportation-related onshore and offshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing or consuming oil and oil products, which, due to their location, could reasonably be expected to discharge oil in quantities that may be harmful into or upon the navigable waters of the United States or adjoining shorelines. 40 C.F.R. § 112.1.

21.     As noted in Paragraph 15, EPA promulgated a regulation, set forth at 40 C.F.R. § 110.3, specifying what quantities of oil may be harmful to the public health or welfare or the environment. Such quantities of oil include discharges that: (a) violate applicable water quality standards, (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or (c) cause a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines. 40 C.F.R. § 110.3.

22.     40 C.F.R. Part 112 requires regulated facilities to prepare and implement SPCC Plans to prevent discharges of oil in harmful quantities into navigable waters.

23.     Pursuant to 40 C.F.R. § 112.3(a), owners and operators of onshore and offshore facilities are required to prepare and implement written SPCC Plans in accordance with 40 C.F.R. Part 112.

### Facility Response Plan Regulations

24.     In 1990, Congress amended Section 311 of the Clean Water Act by enacting the Oil Pollution Act of 1990 ("OPA"). Included in OPA was Section 311(j)(5)(A) and (B), which directed the issuance of new regulations to mitigate potential harm caused by facilities that because of their location "could reasonably be expected to cause substantial harm to the

environment" by discharging oil into or on the navigable waters of the United States or adjoining shorelines (so-called "substantial harm facilities"). 33 U.S.C. § 1321(j)(5)(A) and (B).

25.     In Section 311(j)(5)(A), Congress mandated that the President issue regulations requiring the owners or operators of substantial harm facilities to submit "a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." Section 311(j)(5)(A) of the CWA, 33 U.S.C. § 1321(j)(5)(A).

26.     In 1991, the President delegated to the Administrator of EPA the authority to promulgate such regulations for non-transportation-related onshore facilities.

27.     In 1994, EPA amended 40 C.F.R. Part 112 by promulgating Facility Response Regulations, which are published at 40 C.F.R. §§ 112.20 and 112.21. The Facility Response Regulations require owners and operators of non-transportation-related onshore oil storage and distribution facilities to determine, under the criteria established by EPA in 40 C.F.R. § 112.20(f)(1), whether their facilities could reasonably be expected to cause substantial harm to the environment by discharging oil into or on navigable waters or adjoining shorelines.

28.     If a facility is determined to be a substantial harm facility under these criteria, the Facility Response Regulations require the owner or operator of the facility to prepare and submit to EPA a Facility Response Plan ("FRP"), which details the facility's emergency plans for a worst case oil spill. 40 C.F.R. § 112.20(a).

29.     The FRP must be consistent with the National Oil and Hazardous Substance Contingency Plan, 40 C.F.R. Part 300, and any applicable area contingency plans. 40 C.F.R. § 112.20(g). In addition, the FRP must either follow the format contained in 40 C.F.R. Part 112, Appendix F, or contain the elements described in 40 C.F.R. § 112.20(h)(1)-(11). The facility

must also conduct response training and drill and exercise programs that either follow the National Preparedness for Response Exercise Program ("PREP") Guidelines, or are approved by EPA. 40 C.F.R. § 112.21.

## Remedies for Clean Water Act Violations

30.     Any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, is subject to a civil penalty payable to the United States of up to $25,000 per day for each violation. Section 309(d) of the CWA, 33 U.S.C. § 1319(d). This penalty was increased to $37,500 per day under the Civil Monetary Penalty Inflation Adjustment Rule, promulgated at 40 C.F.R. Part 19, for violations occurring after January 12, 2009.

31.     Any owner, operator, or person in charge of an onshore facility from which oil is discharged in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), is subject to a civil penalty of up to $25,000 per day of violation or up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged. Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A). Alternatively, a person who discharges any pollutant from a point source to waters of the United States without a permit is subject to a civil penalty pursuant to Section 309(d) of the CWA 33 U.S.C. § 1319(d). This penalty was increased by the Civil Monetary Penalty Inflation Adjustment Rule, promulgated at 40 C.F.R. Part 19, to $37,500 per day or $1,100 per barrel for violations occurring after January 12, 2009 and to $2,100 per barrel for violations occurring after December 6, 2013.

32.     Any person who fails or refuses to comply with any regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), is subject to a civil penalty of up to $25,000 per day of violation. Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C). This penalty was

increased to $37,500 per day under the Civil Monetary Penalty Inflation Adjustment Rule, promulgated at 40 C.F.R. Part 19, for violations occurring after January 12, 2009.

## GENERAL ALLEGATIONS

33.    BNSF is a "person" as defined in Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5), and 40 C.F.R. §§ 112.2 and 122.2.

34.    At all times pertinent to this action, BNSF was the "owner or operator" as defined in Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), of the rail cars, locomotives, train tracks, and rail yards referenced in this Complaint.

35.    At all times pertinent to this action, each rail car, locomotive, and rail yard referenced in this Complaint was an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

## Discharges of Oil

### *Mobridge, South Dakota Spill*

36.    On or about March 9, 2010, a locomotive owned and/or operated by Defendant leaked approximately 3,750 gallons of diesel fuel, at least some of which entered Lake Oahe, near Milepost 805.1, in Mobridge, South Dakota.

37.    According to Defendant, this leak was caused by a broken fuel tank sight glass.

38.    The leaked diesel fuel caused a sheen on Lake Oahe.

39.    Lake Oahe is an impoundment of the Missouri River.

40.    The Missouri River is navigable-in-fact and is an interstate water.

41.    Lake Oahe is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 110.1.

42.     The Missouri River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 110.1.

43.     The leaked diesel fuel is a type of "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and a "pollutant" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

44.     The quantity of diesel fuel in the discharge described in paragraph 36 caused a sheen or discoloration of the receiving waters and/or adjoining shoreline and/or violated applicable water quality standards. The discharge was in a quantity that "may be harmful" pursuant to 40 C.F.R. § 110.3.

45.     The discharge referenced in paragraph 36 was not authorized by any CWA permit and was therefore in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

46.     The discharge referenced in paragraph 36 was in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

### *Wind River, Wyoming Spill*

47.     On May 12, 2010, a train owned and operated by Defendant hit a boulder and derailed in Wind River Canyon on the Wind River Indian Reservation near Thermopolis, Wyoming, spilling at least 7,400 gallons of diesel fuel and 230 gallons of lube oil into the Wind River.

48.     The diesel fuel and lube oil referenced in paragraph 47 caused a sheen on the Wind River and discoloration on the adjoining shoreline.

49.     The Wind River, which north of the border of the Wind River Reservation is also known as the Big Horn River, is a perennial, navigable-in-fact water.

50.     The Wind River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 110.1.

51.     The diesel fuel and lube oil referenced in paragraph 47 are types of "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

52.     The quantity of diesel fuel and lube oil in the discharge described in paragraph 47 caused a sheen or discoloration of the receiving waters and/or violated applicable water quality standards, and therefore was a discharge in a quantity that "may be harmful" pursuant to 40 C.F.R. § 110.3.

53.     The discharge referenced in paragraph 47 was not authorized by any CWA permit and was therefore in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

54.     The discharge referenced in paragraph 47 was in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

### *Williston, North Dakota Spill*

55.     On February 7, 2012, a locomotive owned and/or operated by Defendant collided with a salt water tanker truck near Williston, North Dakota, causing the locomotive's fuel tank to rupture and spill approximately 3,000 gallons of diesel fuel.

56.     At least some of the diesel fuel referenced in paragraph 55 reached Stony Creek.

57.     Stony Creek is a tributary of the Missouri River that has a bed, banks, and ordinary high water mark and flows at least seasonally.

58.     Stony Creek is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 110.1.

59.     The diesel fuel referenced in paragraph 55 is a type of "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and a "pollutant" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

60.     The quantity of diesel fuel in the discharge described in paragraph 55 caused a sheen or discoloration of the receiving waters and/or violated applicable water quality standards, and therefore was a discharge in a quantity that "may be harmful" pursuant to 40 C.F.R. § 110.3.

61.     The discharge referenced in paragraph 55 was not authorized by any CWA permit and was therefore in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

62.     The discharge referenced in paragraph 55 was in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

*Minot, North Dakota Spill*

63.     On or about June 22, 2013, approximately 200 gallons of diesel fuel spilled during the filling of a BNSF locomotive at the Minot Yard, in Minot North Dakota.

64.     At least some of the diesel fuel referenced in paragraph 63 reached Livingston Creek and/or a drainage ditch that flows into Livingston Creek.

65.     Livingston Creek is at least a seasonal and intermittent tributary of the Souris River.

66.     The Souris River is a navigable-in-fact and interstate water.

67.     Livingston Creek and the Souris River are each a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 110.1.

68.     The spilled diesel fuel is a type of "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and a "pollutant" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

- 11 -

69.     The quantity of diesel fuel in the discharge described in paragraph 63 caused a sheen or discoloration of the receiving waters and/or adjoining shoreline and/or violated applicable water quality standards. The discharge was in a quantity that "may be harmful" pursuant to 40 C.F.R. § 110.3.

70.     The discharge referenced in paragraph 63 was not authorized by any CWA permit and was therefore in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

71.     The discharge referenced in paragraph 63 was in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

## Spill Prevention Control and Countermeasure Plans

### *Denver Yard*

72.     Defendant owns and/or operates a rail yard at 3190 Fox Street, Denver, Colorado ("the Denver Yard").

73.     The Denver Yard has a total oil storage capacity of at least 1,077,674 gallons. Its largest tank, which stores diesel fuel, has a capacity of 1,000,000 gallons. If not properly contained, a spill from that tank would flow approximately 600 feet to the South Platte River, where it could reasonably be expected to cause a violation of water quality standards and/or a sheen. Uncontained spills or leaks from other tanks at the Denver Yard could result in similar impacts.

74.     The South Platte River is a navigable-in-fact, interstate water.

75.     The South Platte River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 112.2.

76.     The Denver Yard is a "non-transportation-related facility" subject to the SPCC Regulations.

77.     Defendant's February 20, 2013, SPCC Plan for the Denver Yard failed to comply with the SPCC Regulations in the following ways:

(a)     Inadequate descriptions and diagrams of the physical layout of the facility, in violation of 40 C.F.R. § 112.7(a)(3);

(b)     Inadequate discharge predictions, in violation of 40 C.F.R. § 112.7(b);

(c)     Inadequate discussion of general secondary containment, in violation of 40 C.F.R. § 112.7(c);

(d)     Inadequate brittle fracture evaluations, in violation of 40 C.F.R. § 112.7(i);

(e)     Inadequate discussion of facility drainage systems from undiked areas to prevent oil discharges or, alternatively, how final drainage would be engineered to retain oil, in violation of 40 C.F.R. § 112.8(b)(3) and (4);

(f)     Indicating that drainage flows to storm sewers or directly to the South Platte River, despite the requirement that such flow be restrained, in violation of 40 C.F.R. § 112.8(b);

(g)     Inadequate discussion of sized secondary containment, in violation of 40 C.F.R. § 112.8(c)(2);

(h)     Inadequate discussion of integrity testing program, in violation of 40 C.F.R. § 112.8(c)(6);

(i)     Inadequate discussion of sized secondary containment for mobile or portable oil storage containers, in violation of 40 C.F.R. § 112.8(c)(11); and

(j)     Inadequate discussion of provisions for facility transfer operations and pumping and facility processes, in violation of 40 C.F.R. § 112.8(d).

*Grand Forks Yard*

78.     Defendant owns and/or operates a rail yard located at 1796 Demers Avenue, Grand Forks, North Dakota (the "Grand Forks Yard").

79.     The Grand Forks Yard has a total oil storage capacity of 20,490 gallons, of which 10,490 is aboveground. Its largest tank has a capacity 5,630 gallons. If not properly contained, a spill from that tank would flow to a city storm sewer, through the storm sewer to the English Coulee and then to the Red River of the North, where it could reasonably be expected to cause a violation of water quality standards and/or a sheen. Uncontained spills or leaks from other tanks at the Grand Forks Yard could result in similar impacts.

80.     The English Coulee is a tributary of the Red River of the North that flows at least seasonally.

81.     The Red River of the North is a navigable-in-fact, interstate water.

82.     The Red River of the North is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 112.2.

83.     The Grand Forks Yard is a "non-transportation-related facility" subject to the SPCC Regulations.

84.     Defendant's January 2011 SPCC Plan for the Grand Forks Yard failed to comply with the SPCC Regulations in the following ways:

(a)     No documentation of plan reviews and updates, in violation of 40 C.F.R. § 112.5(b);

(b)     Inadequate descriptions and diagrams of the physical layout of the facility, in violation of 40 C.F.R. § 112.7(a)(3);

(c)     Inadequate discharge predictions, in violation of 40 C.F.R. § 112.7(b);

- 14 -

(d)    Inadequate discussion of general secondary containment, in violation of 40 C.F.R. § 112.7(c);

(e)    Inadequate spill contingency plan, in violation of 40 C.F.R. § 112.7(d)(1) and 40 C.F.R. part 109;

(f)    No written procedures for inspections and tests required by 40 C.F.R. part 112, in violation of 40 C.F.R. § 112.7(e);

(g)    No discussion of more stringent state rules, regulations, and guidelines, in violation of 40 C.F.R. § 112.7(j);

(h)    Inadequate discussion of facility drainage systems from undiked areas to prevent oil discharges or, alternatively, how final drainage would be engineered to retain oil, in violation of 40 C.F.R. § 112.8(b)(3 & 4);

(i)    Inadequate discussion of sized secondary containment, in violation of 40 C.F.R. § 112.8(c)(2);

(j)    Inadequate discussion of integrity testing program, in violation of 40 C.F.R. § 112.8(c)(6);

(k)    Inadequate discussion of sized secondary containment for mobile or portable oil storage containers, in violation of 40 C.F.R. § 112.8(c)(11); and

(l)    Inadequate discussion of provisions for facility transfer operations and pumping and facility processes, in violation of 40 C.F.R. § 112.8(d).

### *Minot/Gavin Yard*

85.    Defendant owns and/or operates a rail yard located at 6400 4th Avenue NE, Minot, North Dakota (the "Minot Yard"). The Minot Yard is sometimes called the Gavin rail yard.

86.     The Minot Yard has a total oil storage capacity of 514,951 gallons. Each of its two largest oil tanks has a capacity of 250,000 gallons. If not properly contained, a spill from either of these tanks would flow into a ditch, which flows to Livingston Creek and then to the Souris River, where it could reasonably be expected to cause a violation of water quality standards and/or a sheen. Uncontained spills or leaks from other oil tanks at the Minot Yard could result in similar impacts.

87.     Livingston Creek is a tributary of the Souris River that flows at least seasonally and intermittently.

88.     Livingston Creek is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 112.2.

89.     The Souris River is a navigable-in-fact, interstate water.

90.     The Souris River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 112.2.

91.     The Minot Yard is a "non-transportation-related facility" subject to the SPCC Regulations.

92.     Defendant's January 2011 SPCC Plan for the Minot Yard failed to comply with the SPCC Regulations in the following ways:

(a)     Inadequate descriptions and diagrams of the physical layout of the facility, in violation of 40 C.F.R. § 112.7(a)(3);

(b)     Inadequate discharge predictions, in violation of 40 C.F.R. § 112.7(b);

(c)     Inadequate discussion of general secondary containment, in violation of 40 C.F.R. § 112.7(c);

(d)     Inadequate spill contingency plan, in violation of 40 C.F.R. § 112.7(d)(1) and 40 C.F.R. part 109;

(e)     Inadequate discussion of inspections, tests, and records, in violation of 40 C.F.R. § 112.7(e);

(f)     Inadequate discussion of loading/unloading racks, in violation of 40 C.F.R. § 112.7(h);

(g)     No discussion of more stringent state rules, regulations, and guidelines, in violation of 40 C.F.R. § 112.7(j);

(h)     Inadequate brittle fracture evaluations, in violation of 40 C.F.R. § 112.7(i);

(i)     Inadequate discussion of facility drainage systems from undiked areas to prevent oil discharges or, alternatively, how final drainage would be engineered to retain oil, in violation of 40 C.F.R. § 112.8(b)(3) and (4);

(j)     Inadequate discussion of sized secondary containment, in violation of 40 C.F.R. § 112.8(c)(2);

(k)     Inadequate discussion of integrity testing program, in violation of 40 C.F.R. § 112.8(c)(6);

(l)     Inadequate discussion of sized secondary containment for mobile or portable oil storage containers, in violation of 40 C.F.R. § 112.8(c)(11); and

(m)     Inadequate discussion of provisions for facility transfer operations and pumping and facility processes, in violation of 40 C.F.R. § 112.8(d).

*Guernsey Yard*

93.     Defendant owns and/or operates a rail yard at 100 Cemetery Road, Guernsey, Wyoming ("Guernsey Yard").

94.     The Guernsey Yard's total storage capacity is 1,646,648 gallons. Its largest tank has a capacity of 1,015,162 gallons. This tank stores diesel fuel. If not properly contained, a spill from this tank would flow to the North Platte River, where it could reasonably be expected to cause a violation of water quality standards and/or a sheen. Uncontained spills or leaks from other oil containers at the Guernsey Yard could result in similar impacts.

95.     The North Platte River is a navigable-in-fact, interstate water.

96.     The North Platte River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 112.2.

97.     The Guernsey Yard is a "non-transportation-related facility" subject to the SPCC Regulations.

98.     Defendant's July 1, 2010, SPCC Plan for the Guernsey Yard failed to comply with the SPCC Regulations in the following ways:

   (a)     No documentation of plan reviews and updates, in violation of 40 C.F.R. § 112.5(b);

   (b)     Inadequate descriptions and diagrams of the physical layout of the facility, in violation of 40 C.F.R. § 112.7(a)(3);

   (c)     Inadequate discharge predictions, in violation of 40 C.F.R. § 112.7(b);

   (d)     Inadequate discussion of general secondary containment, in violation of 40 C.F.R. § 112.7(c);

(e)     Inadequate discussion of loading/unloading racks, in violation of 40 C.F.R. § 112.7(h);

(f)     Inadequate brittle fracture evaluations, in violation of 40 C.F.R. § 112.7(i);

(g)     No discussion of more stringent state rules, regulations, and guidelines, in violation of 40 C.F.R. § 112.7(j);

(h)     Inadequate discussion of facility drainage systems from undiked areas to prevent oil discharges or, alternatively, how final drainage would be engineered to retain oil, in violation of 40 C.F.R. § 112.8(b)(3) and (4);

(i)     Inadequate discussion of sized secondary containment, in violation of 40 C.F.R. § 112.8(c)(2);

(j)     Inadequate discussion of integrity testing program, in violation of 40 C.F.R. § 112.8(c)(6);

(k)     Inadequate discussion of engineering containers to prevent discharges, in violation of 40 C.F.R. § 112.8(c)(8);

(l)     Inadequate discussion of sized secondary containment for mobile or portable oil storage containers, in violation of 40 C.F.R. § 112.8(c)(11); and

(m)    Inadequate discussion of provisions for facility transfer operations and pumping and facility processes, in violation of 40 C.F.R. § 112.8(d).

**Facility Response Plans**

***Denver Yard***

99.     The Denver Yard has a total oil storage capacity of at least 1,077,674 gallons.

100.    The Denver Yard is adjacent to the South Platte River.

101.    The South Platte River is navigable-in-fact and a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. § 112.2.

102.    A discharge of oil from the Denver Yard into the South Platte River could reasonably be expected to cause substantial harm to the environment.

103.    The Denver Yard is a "non-transportation-related facility" subject to the FRP Regulations.

104.    In 2014, EPA conducted a five-year review of Defendant's March 2013 FRP for the Denver Yard and found various inadequacies identified in a July 17, 2014 letter from EPA to BNSF.

105.    On July 22, 2014, EPA conducted a government-initiated unannounced exercise ("GIUE") at the Denver Yard. The purpose of the GIUE was to determine whether the Denver Yard was prepared to respond adequately to a hypothetical spill of 2,000 gallons of diesel fuel. In the exercise, Defendant was unable to demonstrate that it could properly deploy a boom in the South Platte River to respond to such a spill.

106.    BNSF was given a second chance to demonstrate proper boom deployment.

107.    On October 15, 2014, Defendant conducted a boom deployment exercise in the presence of EPA representatives. Like the July 22, 2014 GIUE, the assumed scenario was a spill of 2,000 gallons of diesel fuel. Defendant was not able to deploy the boom effectively during this exercise either.

108.    Defendant failed to demonstrate during the July 22 and October 15 exercises the capability to deploy containment within one hour for a discharge of less than 2,100 gallons, in violation of 40 C.F.R. § 122.20, 40 C.F.R. § 122.21, and 40 C.F.R. Part 112, Appendix E, Section 3.3.

*Guernsey Yard*

109.    The Guernsey Yard has a total oil storage capacity of at least 1,646,648 gallons.

110.    The Guernsey Yard is adjacent to the North Platte River.

111.    The North Platte River is a navigable-in-fact water and a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7) and 40 C.F.R. § 112.2.

112.    A discharge of oil from the Guernsey Yard into the North Platte River could reasonably be expected to cause substantial harm to the environment.

113.    The Guernsey Yard is a "non-transportation-related facility" subject to the FRP Regulations.

114.    In 2014, EPA conducted a five-year review of Defendant's FRP for the Guernsey Yard with a last revision date of March 2009 and found various inadequacies identified in a July 17, 2014 letter from EPA to BNSF.

## FIRST CLAIM FOR RELIEF
### (Mobridge, South Dakota Spill)

115.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

116.    The discharge of oil described in paragraphs 36-46 relating to the Mobridge spill was in such a quantity that may be harmful to the public health or welfare pursuant to 40 C.F.R. § 110.3 and therefore was in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

117.    The discharge of oil described in paragraphs 36-46 relating to the Mobridge spill constitutes an unauthorized discharge of a pollutant from a point source to navigable waters, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

118.    Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation or per barrel of oil discharged, pursuant to 40 C.F.R. Part 19 and either

Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), or Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

## SECOND CLAIM FOR RELIEF
(Wind River, Wyoming Spill)

119.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

120.    The discharge of oil described in paragraphs 47-54 relating to the Wind River spill was in such a quantity that may be harmful to the public health or welfare of the United States pursuant to 40 C.F.R. § 110.3 and therefore was in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

121.    The discharge of oil described in paragraphs 47-54 relating to the Wind River spill constitutes an unauthorized discharge of a pollutant from a point source to navigable waters, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

122.    Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation or per barrel of oil discharged, pursuant to 40 C.F.R. Part 19 and either Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), or Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

## THIRD CLAIM FOR RELIEF
(Williston, North Dakota Spill)

123.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

124.    The discharge of oil described in paragraphs 55-62 relating to the Williston spill was in such a quantity that may be harmful to the public health or welfare pursuant to 40 C.F.R. § 110.3 and therefore was in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

125.     The discharge of oil described in paragraphs 55-62 relating to the Williston spill constitutes an unauthorized discharge of a pollutant from a point source to navigable waters, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

126.     Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation or per barrel of oil discharged, pursuant to 40 C.F.R. Part 19 and either Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), or Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

## FOURTH CLAIM FOR RELIEF
(Minot, North Dakota Spill)

127.     Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

128.     The discharge of oil described in paragraphs 63-71 relating to the Minot spill was in such a quantity that may be harmful to the public health or welfare pursuant to 40 C.F.R. § 110.3 and therefore was in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

129.     The discharge of oil described in paragraphs 63-71 relating to the Minot spill constitutes an unauthorized discharge of a pollutant from a point source to navigable waters, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

130.     Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation or per barrel of oil discharged, pursuant to 40 C.F.R. Part 19 and either Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), or Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

## FIFTH CLAIM FOR RELIEF
(SPCC Violations – Denver Yard)

131.     Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

132.     Defendant is required to have an SPCC Plan for its Denver Yard.

133.     Defendant's SPCC Plan for the Denver Yard, dated February 20, 2013, did not meet the requirements of the SPCC Regulations.

134.     Each deficiency in the February 20, 2013 SPCC Plan for the Denver Yard is a violation of the requirements of the SPCC Regulations.

135.     Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. §1321(b)(7)(C), and 40 C.F.R. Part 19, Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation.

## SIXTH CLAIM FOR RELIEF
(SPCC Violations – Grand Forks Yard)

136.     Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

137.     Defendant is required to have an SPCC Plan for its Grand Forks Yard.

138.     Defendant's SPCC Plan for the Grand Forks Yard, dated January 2011, did not meet the requirements of the SPCC Regulations.

139.     Each deficiency in the January 2011 SPCC Plan for the Grand Forks Yard is a violation of the requirements of the SPCC Regulations.

140.     Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. §1321(b)(7)(C), and 40 C.F.R. Part 19, Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation.

## SEVENTH CLAIM FOR RELIEF
(SPCC Violations – Minot/Gavin Yard)

141.     Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

142.     Defendant is required to have an SPCC Plan for its Minot Yard.

143.     Defendant's SPCC Plan for the Minot Yard, dated January 2011, did not meet the requirements of the SPCC Regulations.

144.    Each deficiency in the January 2011 SPCC Plan for the Minot Yard is a violation of the requirements of the SPCC Regulations.

145.    Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. §1321(b)(7)(C), and 40 C.F.R. Part 19, Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation.

## EIGHTH CLAIM FOR RELIEF
(SPCC Violations – Guernsey Yard)

146.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

147.    Defendant is required to have an SPCC Plan for its Guernsey Yard.

148.    Defendant's SPCC Plan for the Guernsey Yard, dated July 1, 2010, did not meet the requirements of the SPCC Regulations.

149.    Each deficiency in the July 1, 2010 SPCC Plan for the Guernsey Yard is a violation of the requirements of the SPCC Regulations.

150.    Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. §1321(b)(7)(C), and 40 C.F.R. Part 19, Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation.

## NINTH CLAIM FOR RELIEF
(FRP Violations – Denver Yard)

151.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

152.    Defendant is required to have an FRP for its Denver Yard.

153.    Defendant's FRP for the Denver Yard, dated March 2013, did not meet the requirements of the FRP Regulations.

154.    Each deficiency in the March 2013 FRP is a violation of 40 C.F.R. § 112.20.

155.     In addition, Defendant failed to implement a facility response plan training program or a facility drill/exercise program at the Denver Yard, as described in paragraphs 105-108, in violation of 40 C.F.R. § 112.20 and 40 C.F.R. Part 112, Appendix E, Section 3.3.1.

156.     Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. §1321(b)(7)(C), and 40 C.F.R. Part 19, Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation.

## TENTH CLAIM FOR RELIEF
(FRP Violations – Guernsey Yard)

157.     Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

158.     Defendant is required to have an FRP for its Guernsey Yard.

159.     Defendant's FRP for the Guernsey Yard, with a last revision date of March 2009, did not meet the requirements of the FRP Regulations.

160.     Each deficiency in the March 2009 FRP is a violation of 40 C.F.R. § 112.20.

161.     Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. §1321(b)(7)(C), and 40 C.F.R. Part 19, Defendant is liable for civil penalties not to exceed the statutory maximum per day for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court enter judgment in its favor against BNSF by:

A.     Ordering BNSF to pay a civil penalty of up to $37,500 per day of violation, or up to $1,100 per barrel of oil, for each violation of Section 311(b) and (b)(3) of the CWA, 33 U.S.C. § 1321(b) and (b)(3), pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), and 40 C.F.R. Part 19; or alternatively, ordering BNSF to pay a civil penalty of up to $37,500 per

day of violation for each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), pursuant

to Section 309(d) of the CWA, 33 U.S.C. § 1319(d) and 40 C.F.R. Part 19; and

   B.  Ordering BNSF to pay a civil penalty of up to $37,500 per day of violation for

each violation of the SPCC and FRP Regulations, pursuant to Section 311(b)(7)(C) of the CWA,

33 U.S.C. § 1321(b)(7)(C), and 40 C.F.R. Part 19.


          Respectfully submitted,


          NATHANIEL DOUGLAS
          Deputy Chief, Environmental Enforcement Section
          Environment and Natural Resources Division
          United States Department of Justice


          <u>s/ Mark C. Elmer</u>
          MARK C. ELMER
          Senior Counsel
          Environmental Enforcement Section
          Environment and Natural Resources Division
          United States Department of Justice
          999 18th Street, South Terrace, Suite 370
          Denver, Colorado 80202
          Telephone: (303) 844-1352
          FAX: (303) 844-1350
          Email: mark.elmer@usdoj.gov

OF COUNSEL:

MARGARET J. (PEGGY) LIVINGSTON
Enforcement Attorney
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, Colorado 80202


        *Attorneys for the United States of America*